07-5041-ag
Civil Service Employees Assn. v. NLRB

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: December 4, 2008                    Decided: June 19, 2009)

Docket No.  07-5041-ag

_____

CIVIL SERVICE EMPLOYEES ASSOCIATION, LOCAL 1000, AFSCME,

*Petitioner*,

— v .—

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

CORRECTIONAL MEDICAL SERVICES,

*Intervenor*.

_____

Before:        LEVAL, POOLER, AND B.D. PARKER, *Circuit Judges*.

_____

Petition for review of an NRLB decision and order holding lawful an employer's termination of non-union employees for having picketed a health clinic for the purpose of seeking recognition of a union as a collective bargaining agent without providing 10-days prior notice.  We conclude that the termination was not lawful because such picketing is a right of an employee recognized in 29 U.S.C. § 157, § 158(g) on its face does not apply to employees in their individual capacities, and the distinctions Congress made in § 158(d) between striking and picketing indicate an intent to protect an employee from such discipline imposed by reason of participation in picketing without the notice required of labor organizations by § 158(g). GRANTED.

_____

1

HAROLD CRAIG BECKER (Nancy Hoffman, General Counsel, Miguel G. Ortiz, Senior Associate Counsel, Daren Rylewicz, Senior Associate Counsel, CSEA/AFSCME Local 1000, Albany N.Y., *on the brief*), Chicago, IL, *for Petitioner Civil Service Employees Association, Local 1000, AFSCME.*

ELIZABETH A. HEANEY, Attorney (Fred B. Jacob, Supervisory Attorney, Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, *on the brief*), Washington, DC, *for Respondent National Labor Relations Board.*

CYNTHIA K. SPRINGER, Baker & Daniels LLP, Indianapolis, IN, *for Intervenor Correctional Medical Services, Inc.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

This petition by the Civil Service Employees Association, Local 1000, AFSCME, requires us to consider whether the National Labor Relations Board offered a defensible construction of section 8 of the National Labor Relations Act when it upheld a health care institution's discharge of employees by reason of their having participated in picketing for the purpose of securing recognition of a union as their collective bargaining agent without having given the 10-days notice which is required of a labor organization by section 8(g). We conclude that the Board's construction was not defensible and grant the petition.

**BACKGROUND**

The Petitioner ("Union") represents correctional officers at the Albany County

Correctional Facility in Albany, New York, and sought to organize and represent employees of a health clinic located in the Albany facility operated by Correctional Medical Services, Inc. ("CMS"), the Intervenor.[1] In August 2002, the Union requested that CMS recognize it as the collective-bargaining representative of all clinic employees except physicians, supervisors and one clerical worker. CMS rejected the request.

The Union responded by organizing a demonstration at the facility without giving prior notice to CMS. On September 12, twenty individuals, including five clinic employees, walked in a circle in front of the facility's main entrance for approximately 40 minutes, demonstrating and picketing for recognition of the Union by CMS as their collective bargaining agent. The entrance was used, among other things, by vehicles making daily deliveries of pharmaceuticals and other supplies to the clinic, and served as the point of exit for vehicles transporting inmates in need of off-site emergency medical care. None of the five picketing clinic employees was a member of the Union. None was on duty at the time. They did not block the entrance, and vehicles were able to enter and exit the facility unimpeded. The demonstration was peaceful.

The next day, CMS issued letters to its five employees who had participated. The letters stated that the Union's picketing without advance notice had been illegal and that "[e]mployees who participate in an unlawful picket lose their protection under the Act." The letters indicated that CMS intended to file charges with the NLRB ("Board") and that, upon completion of the Board's investigation, CMS would advise the employees of what it intended to do. On September 16, CMS filed charges alleging that the picketing violated section 8(g) because the

[1] The parties agree on the relevant facts.

3

Union failed to provide 10-days prior notice, as required by that section.

Subsequently, the Regional Office issued a complaint against the Union, alleging that it violated section 8(g).[2] Shortly thereafter, CMS fired the five employees for engaging in an "illegal picket." CMS also posted a notice advising its employees of section 8(g)'s notice requirement and stating, apparently based on the issuance of the complaint alone, that "[t]he NLRB has ruled [the Union's] picket was illegal." One month after the employees' dismissal, CMS reinstated them without backpay.

In October 2002, the Union filed charges with the NLRB alleging that CMS had violated the Act by terminating the five employees. The Regional Office issued a complaint alleging that, notwithstanding the Union's prior violation of section 8(g), CMS violated section 8(a)(1) and (a)(3) by dismissing the participating employees. The parties agreed to waive a hearing before an Administrative Law Judge and provided the NLRB with a stipulated record.

On May 31, 2007, a divided panel of the NLRB held that CMS's dismissal of the employees did not violate the Act. The majority reasoned that:

> [t]he Union violated Section 8(g) of the Act by conducting picketing of a health care institution without giving the required advanced notice. The employees who engaged in the picketing were not protected by the Act, and, accordingly, [CMS] did not violate the Act by discharging them.

The majority contended that, even though section 7 had been interpreted to permit employees to engage in picketing, an "employee who pickets in violation of section 8(g) is engaged in

---

[2] The Union later entered into an informal settlement agreement of the case with a non-admissions clause.

unprotected conduct, and is thus vulnerable to employer discipline." For support, the majority cited NLRB precedent that identified picketing that violated sections 8(b)(4) and 8(b)(7) as unprotected conduct that interfered with the "legitimate interests of the employer." Finally, the majority rejected the dissent's contention that the Act expressly limited the Board's authority to determine that picketing in violation of section 8(g) was unprotected employee conduct, contending instead that, notwithstanding section 7's general authorization of picketing, the Board had discretion to fashion this exception.

The dissenting member argued that "Congress [chose] to preclude employers from taking action against picketing [health care industry] employees" because, unlike its treatment of health care employees who engage in an improperly noticed strike, section 8(d) does not eliminate the "employee" status of health care workers who engage in improperly noticed pickets. According to the dissenting member, the majority's approach rendered superfluous section 8(d)'s disparate treatment of improperly noticed striking, on the one hand, and improperly noticed picketing, on the other, because the net effect is that "[b]oth strikers and picketers could be lawfully discharged without reference to [s]ection 8(d) solely because [s]ection 8(g) proscribes both kinds of conduct." Moreover, unlike picketing under section 8(b), where Congress left "the Board free to fashion its own rule with respect to sanctions," the dissent argued that "[w]here picketing of health-care employers is concerned . . . [s]ection 8(d), in conjunction with 8(g), provides an express limitation on the Board's authority." She argued that the majority's decision exceeded this limitation because sections 8(d) and 8(g) show "Congress itself chose not to treat employees' picketing, as opposed to striking, as lawful grounds for discharge, notwithstanding the

5

unlawfulness of the Union's failure to provide proper notice of the picketing."

**DISCUSSION**

*A. Standard of Review*

We review the NLRB's decisions with deference so long as the result is based on a construction of the Act that does not extend the NLRB's authority beyond what Congress assigned. As a general matter, we "review[] the Board's legal conclusions to ensure they have a reasonable basis in law," and "afford the Board a degree of legal leeway" when it interprets the Act. *Cibao Meat Prods., Inc. v. NLRB*, 547 F.3d 336, 339 (2d Cir. 2008) (internal quotation marks omitted). However, the NLRB's interpretation is not due substantial deference automatically; it must constitute a reasonable reading of the statute. In other words, the Board construction is entitled to considerable deference when it "represents a defensible construction of the statute." *See Elec. Contractors., Inc. v. NLRB*, 245 F.3d 109, 116 (2d Cir. 2001) (quoting *NLRB v. Local Union No. 103, Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350 (1978)). This deference is not owed when the NLRB moves "into a new area of regulation which Congress [has] not committed to it." *Local Union No. 103*, 434 U.S. at 350 (internal quotation marks omitted). The courts are called on to guard against the "unauthorized assumption by [the Board] of major policy decisions properly made by Congress." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965).

The dispositive issue for us is whether the NLRB advanced a defensible construction of the Act when it concluded that, after the 1974 amendments, picketing for the purpose of

collective bargaining that does not accord with the notice section 8(g) requires of the labor organization exposes employees who participate in such picketing to discharge, notwithstanding "employee" protections under section 7 of the Act. This exercise in statutory analysis necessarily begins with the plain meaning of the Act and, absent ambiguity, generally ends there. *Puello v. BCIS*, 511 F.3d 324, 327 (2d Cir. 2007). To discern plain meaning, we examine the statutory language and design of the statute as a whole. *Id.* When analyzing the meaning of successive legislative actions, we "assume that Congress passed each subsequent law with the full knowledge of the existing legal landscape." *In re Northwest Airlines Corp.*, 483 F.3d 160, 169 (2d Cir. 2007). Finally, we may resort to legislative history to determine a statute's meaning if, after this analysis, the meaning of the statute is ambiguous. *Puello*, 511 F.3d at 327. Although the parties devote substantial portions of their briefs to argument based on the 1974 amendments' legislative history, we find it unnecessary to engage in an examination of this sometimes inconclusive material because the plain meaning of the statute is sufficiently evident.

Section 7 grants "[e]mployees" the right to form and join "labor organizations," and undertake concerted activity "for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The Supreme Court and the NLRB have long recognized employee picketing not prohibited by the Act as activity protected under this provision. *See Bristol Farms, Inc.*, 311 N.L.R.B. 437, 438 n.8 (1993). Under section 8(a), an employer commits an unfair labor practice if it interferes with these rights or discriminates in regard to hiring, tenure, or any term or condition of employment to discourage union membership. 29 U.S.C. § 158(a)(1), (3). Section 2 of the Act explicitly distinguishes between an "employee," and a "labor

7

organization" such as a union.  *See* 29 U.S.C. § 152(3), (5).  On its face, the Act's definition of "labor organization" does not include employees in their individual capacities, even if they are acting in coordination with a union to organize a work place.  A "labor organization" is defined as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose . . . of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."  29 U.S.C. § 152(5).[3]  In contrast, section 8(b), which describes unfair labor practices by unions, explicitly includes individuals acting as agents for a labor organization within its scope, stating in substance that a union engages in an unfair labor practice if the union "or its agents," among other things, (1) coerce any person to require another employer to recognize the labor organization as the representative of the other employer's employees where the labor organization is not already their certified representative, 29 U.S.C. § 158(b)(4)(ii)(B), or (2) picket or cause to be picketed an employer in an effort to force the employer to recognize a union unless it is already the certified representative of the employees, 29 U.S.C. § 158(b)(7).

In 1974 Congress amended the Act in a number of ways.  Before the amendments, the Act defined "employer" not to include "any corporation or association operating a hospital, if no part of the net earnings inure[d] to the benefit of any private shareholder or individual."  Pub. L. No. 80-101, sec. 101, § 2(2), 61 Stat. 136, 137 (1947).  The amendments eliminated this

---

[3] The Act's definition of "labor organization" does not include employees in an individual capacity who are not yet part of a union, even if their purpose is to promote union organization, unless they are acting as an "employee representation committee or plan."  29 U.S.C. § 152(5).  There is no allegation that the five CMS employee-picketers were acting as an "employee representation committee or plan."

exclusion, thereby bringing hospitals and other health care facilities under the coverage of the Act. *See* Pub. L. No. 93-360, § 1(a), 88 Stat. 395, 395 (1974). Congress also imposed limits on activities in which labor organizations could engage with respect to health care institutions, and provided for new sanctions against employees who undertook certain prohibited activities against these institutions. *See id.* § 1(c)-(g), 88 Stat. at 395-96. Codified in the newly-added section 8(g) of the Act, the limits require "a labor organization" to give "not less then ten days prior notice" to various parties "before engaging in any strike, picketing, or other concerted refusal to work at any health care institution." 29 U.S.C. § 158(g). Thus, a "labor organization" violates the Act if it strikes or pickets a health care institution without giving the specified period of notice. But the statute does not state that an employee who does the same commits a violation. *Id.*

Under the modified section 8(d), an employee who engages in "any *strike*" at the institution that does not satisfy the ten-day notice requirement is no longer an "employee" under the Act, thereby becoming ineligible for the section 7 rights that employee status confers. 29 U.S.C. § 158(d) (emphasis added).[4] But section 8(d) does not include a comparable provision about employees who participate in *picketing* conducted by the labor organization in violation of those notice requirements. We conclude that Congress intended a clear distinction. While labor organizations are subject to sanction for *either* striking or picketing without observing the notice requirement specified by section 8(g) because of the obligation that section attributes to them, the statute specifies sanctions for employees who participate in the violation only in the case of

---

[4] "Any employee . . . who engages in any strike within the appropriate period specified in [29 U.S.C. § 158(g)] . . . shall lose his status as an employee of the employer engaged in the particular labor dispute . . . ." 29 U.S.C. § 158(d).

strikes and not in the case of picketing (unless the employees are agents of the labor organization and have violated section 8(b)).

We believe this interpretation is consistent with the design of the statute. In the 1974 amendments, Congress extended the protections of the Act to employees of hospitals and other health care organizations by eliminating an exclusion that had exempted these entities. At the same time, Congress imposed in section 8(g) a ten-day notice requirement on labor organizations organizing strikes or pickets of healthcare institutions but did not extend the notice requirement to individual employees. Congress also provided in section 8(d) that employees who strike after a labor organization fails to give the required notice lose their status as employees protected by the Act, and, as a result, could be discharged or otherwise disciplined. Section 8(d), however, did not extend the "loss-of-status" sanction to employees who merely picket.

This interpretation of section 8(g) comports with the role section 8 as a whole plays in the structure of the Act. Section 7, which provides "[e]mployees" with the right to, among other things, "form, join, or assist labor organizations . . . and to engage in other concerted activities for the purposes of collective bargaining," functions as a broad conferral of rights upon employees. 29 U.S.C. § 157. Section 8 defines unfair labor practices by employers and labor organizations, serving both to protect employees' section 7 rights and identify behavior that Congress has judged impermissible. *See* 29 U.S.C. § 158. A construction of section 8(g) that imposes no implicit obligation on, and hence on its own authorizes no sanction against, employees in their individual capacity is consistent with this statutory structure. Rather, section 8(d), which explicitly refers to employee conduct, specifies the sanctions to which employees in

10

their individual capacities are subject for behavior that does not conform with the notice requirements of section 8(g).

Other provisions of section 8 that limit picketing support our interpretation. *See, e.g.,* 29 U.S.C. § 158(b)(4), (7). For example, section 8(b) prohibits "a labor organization *or its agents*" from picketing for certain purposes. 29 U.S.C. § 158(b) (emphasis added). In contrast to our interpretation of section 8(g), the NLRB has held that, in certain circumstances, this subsection applies to individual employees. *See, e.g., Rapid Armored Truck Corp.*, 281 N.L.R.B. 371, 371 n.1 (1986); *Local 707*, *Motor Freight Drivers*, 196 N.L.R.B. 613, 614 (1972). However, the explicit reference in section 8(b)'s prohibition to "agents" of a labor organization stands in contrast to the language of section 8(g), whose express prohibitions name only "labor organization[s]." For this reason, the extensive case law explicating section 8(b) which the majority relied on and which the General Counsel cites to us is inapposite.[5] *See Corr. Med. Servs.*, 349 N.L.R.B. 1198, 1203 (2007).

Considering the 1974 amendments in the light of the legal landscape in place at the time of their enactment reinforces the view that employees who picket peacefully for the purpose of collective bargaining without providing the notice section 8(g) requires have generally not acted contrary to law in their individual capacity or forfeited the protections of section 7. On multiple occasions prior to 1974, the Supreme Court recognized peaceful picketing as conduct protected by the First Amendment. *See e.g.*, *Amalgamated Food Employees Union v. Logan Valley Plaza*,

---

[5] We express no view whether the employees who were dismissed were subject to sanctions for violation of section 8(b)(7), as the Board did not proceed in that theory and made no finding that any were acting as an "agent" of the labor organization.

391 U.S. 308, 313 (1968) ("[P]eaceful picketing . . . is, absent other factors involving the purpose or manner of the picketing, protected by the First Amendment."), *overruled on other grounds by Hudgens v. NLRB*, 424 U.S. 507 (1976); *Bldg. Serv. Employees Int'l Union v. Gazzam*, 339 U.S. 532, 536 (1950) ("[P]icketing is in part an exercise of the right of free speech guaranteed by the Federal Constitution."). While Congress had previously imposed statutory limitations on peaceful picketing in the context of labor relations, the Court recognized that Congress's actions were aimed at targeting "isolated evils." *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 284 (1960); *see also NLRB v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 62 (1964) ("Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable."). As a result, the Supreme Court narrowly interpreted limitations on peaceful picketing and required a clear statement from Congress of the conditions in which it intended to limit such picketing. *See Fruit & Vegetable Packers*, 377 U.S. at 63 ("We . . . have not ascribed to Congress a purpose to outlaw peaceful picketing unless there is the clearest indication in the legislative history that Congress intended to do so as regards the particular ends of the picketing under review." (internal citation and quotation marks omitted)). We assume by convention that Congress was aware of this interpretive approach when it considered the amendments and approved their final language.

Since the text of sections 8(g) and 8(d) shows no intention to punish individual employees who do not strike but peacefully picket, it would not be appropriate for us to attribute one.[6]

Finally, the General Counsel contends that unless the picketing employees are subject to discipline, heath care facilities would be at risk and employers would be without remedy for non-compliance with section 8(g). But this case involves peaceful picketing by off-duty employees that caused no disruption to the operation of the clinic. Although we are not required to decide the issue, we note that health care facilities confronted with strikes or union-inspired disruptive behavior are not without potent remedies in appropriate cases. *See Montefiore Hosp. & Med. Ctr. v. NLRB*, 621 F.2d 510 (2d Cir. 1980). CMS successfully charged the Union with violating section 8(g) for its role in organizing the picketing. Congress has empowered the NLRB to issue cease-and-desist orders and seek injunctive relief. *See* 29 U.S.C. § 160(c), (j). Congress has also rendered labor organizations "bound by the acts of [their] agents" in certain cases. 29 U.S.C. § 185(b). Nonetheless, the General Counsel's argument is not without force. It is indeed possible for us to conceive of certain circumstances where protected picketing could cause disruption in

---

[6] On appeal, the Board argues that at the time of the 1974 amendments, Congress was aware of a clear distinction between an employee's *loss of status* under the Act, which makes a worker vulnerable to discharge for any reason, and *unprotected conduct*, which makes an employee vulnerable to discharge for engaging in that conduct. *See Fort Smith Chair Co.*, 143 NLRB 514, 517-18 (1963), *enforced sub nom. United Furniture Workers of America, AFL-CIO, Local 270 v. NLRB*, 336 F.2d 738, 742 (D.C. Cir. 1964). The Board argues that Congress intended section 8(d) to impose a loss-of-status sanction on employees who strike in violation of 8(g), whereas employees who participated in any action that did not conform with section 8(g)'s notice requirement engaged in unprotected conduct because their actions violated the law. We are not persuaded by this argument because nothing in the statutory language indicates that section 8(g) imposes an obligation on employees in their individual capacity, and peaceful picketing was generally protected conduct at the time of the 1974 amendments.

13

the ability of a health care facility to deliver health care. The only answer a court can give, however, is that, as we read the governing statutes, this is what Congress decreed in its effort to balance competing interests. If the balance is imperfect, the Board should petition Congress to fix it. When Congress has addressed an issue with sufficient clarity, a court is not at liberty to deviate from the statutory commands merely because it may find that it would have been wiser for Congress to set the balance otherwise.

## CONCLUSION

The petition for review is GRANTED, the decision and order of the NLRB are VACATED, and the case is REMANDED for further proceedings consistent with this opinion.